IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

GREENVILLE DIVISION

| | |
|---|---|
| Alfred Seabrook, ) | |
| ) | Civil Action No. 6:14-2475-TMC-KFM |
| Plaintiff, ) | |
| ) | **REPORT OF MAGISTRATE JUDGE** |
| vs. ) | |
| ) | |
| Carolyn W. Colvin, Acting ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |
| ) | |

This case is before the court for a report and recommendation pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.), concerning the disposition of Social Security cases in this District, and Title 28, United States Code, Section 636(b)(1)(B).[1]

The plaintiff brought this action pursuant to Sections 205(g) and 1631(c)(3) of the Social Security Act, as amended (42 U.S.C. 405(g) and 1383(c)(3)), to obtain judicial review of a final decision of the Commissioner of Social Security denying his claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act.

**ADMINISTRATIVE PROCEEDINGS**

The plaintiff filed an application for supplemental security income ("SSI") benefits on November 16, 2010. He also filed an application for disability insurance benefits ("DIB") on January 26, 2011. In both applications the plaintiff alleges that he became unable to work on November 1, 2009. The applications were denied initially and on reconsideration by the Social Security Administration. On July 26, 2011, the plaintiff

---

[1] A report and recommendation is being filed in this case, in which one or both parties declined to consent to disposition by the magistrate judge.

requested a hearing. The administrative law judge ("ALJ"), before whom the plaintiff and Robert E. Brabham, Jr., an impartial vocational expert, appeared on October 2, 2012, considered the case *de novo*, and on January 31, 2013, found that the plaintiff was not under a disability as defined in the Social Security Act, as amended. The ALJ's finding became the final decision of the Commissioner of Social Security when the Appeals Council denied the plaintiff's request for review on April 14, 2014. The plaintiff then filed this action for judicial review.

In making the determination that the plaintiff is not entitled to benefits, the Commissioner has adopted the following findings of the ALJ:

> (1) The claimant last met the insured status requirements of the Social Security Act on March 31, 2011.
>
> (2) The claimant has not engaged in substantial gainful activity since November 1, 2009, the alleged onset date (20 C.F.R §§ 404.1571 *et seq.*, and 416.971 *et seq.*).
>
> (3) The claimant has the following severe impairments: status post traumatic head injury and seizure disorder, controlled on prescribed medication; borderline intellectual functioning; obesity (20 C.F.R. §§ 404.1520(c) and 416.920(c)).
>
> (4) The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).
>
> (5) After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform work with restrictions that require simple, routine tasks; occasional ongoing interaction with the general public; no lifting or carrying over 20 pounds occasionally and 10 pounds frequently; no more than frequent stooping, crouching, kneeling, and balancing; occasional crawling and climbing stairs/ramps; no climbing ladders, ropes, or scaffolds; no tasks that require fine distant visual acuity; and no exposure to hazards such as unprotected heights and dangerous machinery.

>   (6)   The claimant is capable of performing past relevant work as a press operator. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 C.F.R. §§ 404.1565 and 416.965).
>
>   (7)   The claimant has not been under a disability, as defined in the Social Security Act, from November 1, 2009, through the date of this decision (20 C.F.R. §§ 404.1520(g) and 416.920(g)).

The only issues before the court are whether proper legal standards were applied and whether the final decision of the Commissioner is supported by substantial evidence.

## APPLICABLE LAW

The Social Security Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). "Disability" is defined in 42 U.S.C. § 423(d)(1)(A) as:

> the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

To facilitate a uniform and efficient processing of disability claims, the Social Security Act has by regulation reduced the statutory definition of "disability" to a series of five sequential questions. An examiner must consider whether the claimant (1) is engaged in substantial gainful activity, (2) has a severe impairment, (3) has an impairment that equals an illness contained in the Social Security Administration's Official Listings of Impairments found at 20 C.F.R. Part 4, Subpart P, App. 1, (4) has an impairment that prevents past relevant work, and (5) has an impairment that prevents him from doing substantial gainful employment. 20 C.F.R. §§ 404.1520, 416.920. If an individual is found

3

not disabled at any step, further inquiry is unnecessary. *Id.* §§ 404.1520(a)(4), 416.920(a)(4).

A plaintiff is not disabled within the meaning of the Act if he can return to past relevant work as it is customarily performed in the economy or as the claimant actually performed the work. SSR 82–62, 1982 WL 31386, at *3. The plaintiff bears the burden of establishing his inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5). He must make a prima facie showing of disability by showing he is unable to return to his past relevant work. *Grant v. Schweiker*, 699 F.2d 189, 191 (4th Cir. 1983).

Once an individual has established an inability to return to his past relevant work, the burden is on the Commissioner to come forward with evidence that the plaintiff can perform alternative work and that such work exists in the regional economy. The Commissioner may carry the burden of demonstrating the existence of jobs available in the national economy which the plaintiff can perform despite the existence of impairments which prevent the return to past relevant work by obtaining testimony from a vocational expert. *Id.*

The scope of judicial review by the federal courts in disability cases is narrowly tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the correct law was applied. *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990). Consequently, the Act precludes a *de novo* review of the evidence and requires the court to uphold the Commissioner's decision as long as it is supported by substantial evidence. *See Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (citing *Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). The phrase "supported by substantial evidence" is defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct

> a verdict were the case before a jury, then there is "substantial evidence."

*Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966) (citation omitted).

Thus, it is the duty of this court to give careful scrutiny to the whole record to assure that there is a sound foundation for the Commissioner's findings and that the conclusion is rational. *Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed. *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

## EVIDENCE PRESENTED

### *Evidence Prior to Relevant Period*

Following his arrest for driving under the influence, between May 2004 and February 2005, the plaintiff participated in the Dawn Center's mandatory Alcohol and Drug Safety Program (Tr. 261, 270). During that period, the plaintiff reported remaining sober. Upon release, the plaintiff's alcohol dependency was in early full remission (Tr. 261).

In March 2005, the plaintiff sustained a head injury resulting in a brain hemorrhage. He did not require surgery. The trauma resulted in some vasogenic white matter edema (Tr. 344). Following his injury, the plaintiff took seizure medication for a short period of time and then stopped the medication. He may have had one or two seizures after stopping his medication (Tr. 352).

In March 2006, the plaintiff's brother attempted to involuntarily commit the plaintiff for alcohol abuse. The plaintiff was treated and released from the hospital in one day for alcohol dependency. At that time, he smoked a half pack of cigarettes a day (Tr. 263-64).

On July 27, 2007, John C. Whitley, III, Ph.D., conducted a psychological evaluation of the plaintiff. At the time, the plaintiff lived with his brother. He had adequate self-care skills. The plaintiff reported drinking alcohol and smoking cigarettes on a

consistent basis for the last 15-20 years. The plaintiff stated that he completed the 11th grade in regular classes before quitting. The plaintiff could bathe and dress independently, complete household chores (i.e., washing dishes and washing and folding clothes), and shop for food and clothing with assistance. He socialized with his family (Tr. 270-73). The plaintiff was adequately dressed and groomed. He had a normal affect, pleasant mood, good eye contact, normal motor behavior, and fair cooperation, but he had moderately unclear and rapid speech, poor grammar and language skills, "somewhat" impaired short-term memory and concentration, grossly intact long-term memory, poor proverb interpretation, and poor insight and judgment. On the Wechsler Adult Intelligence Scale, Third Edition, he scored a verbal IQ of 60, a performance IQ of 62, and a full scale IQ of 57 (Tr. 271-72). On the Wechsler Memory Scale, Third Edition, the plaintiff demonstrated deficits in memory functioning (Tr. 273). On the Wide Range Achievement Test, Fourth Edition, the plaintiff scored at a 1.3 grade level for reading and a 3.7 grade level for mathematics (Tr. 272). Dr.Whitley stated the plaintiff's test scores were a mild underestimation of his true ability (Tr. 271). Dr. Whitely diagnosed the plaintiff with borderline intellectual disorder to mental retardation and alcohol dependence in partial remission (Tr. 272). He assigned the plaintiff a Global Assessment of Functioning ("GAF")[2] score of 58 (Tr. 273).

---

[2] A GAF score is a number between 1 and 100 that measures "the clinician's judgment of the individual's overall level of functioning." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 32-34 (Text Revision 4th ed. 2000) ("*DSM-IV*"). A GAF score between 61 and 70 indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well. *Id.* A GAF score between 51 and 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score between 41 and 50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *Id.* The court notes that the fifth edition of the DSM, published in 2013, has discontinued use of the GAF for several reasons, including "its conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice." *See* Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders*, 16 (5th ed. 2013) ("*DSM–V*").

6

Dr. Whitley concluded that the plaintiff appeared limited to "some point" on skilled work tasks and had some difficulty with timely completion of "detailed" tasks and "multiple-step" instruction, but he could follow simple instructions (Tr. 270, 273). The plaintiff had adequate self-care skills. He appeared to require some assistance with organization activities and financial matters. The plaintiff could deal with public situations adequately (although he needed "some assistance with purchasing") and could interact with others in a predictable manner. The plaintiff would not decompensate under normal levels of stress demands and pressure (Tr. 273).

On April 9, 2009, Ester R. Hare, M.D., performed a physical consultative examination of the plaintiff. Based on the plaintiff's statements, Dr. Hare stated that the plaintiff had a seizure disorder with an adult onset that was likely related to alcohol use. At the time of the examination, Dr. Hare was unaware of the plaintiff's prior brain injury. The plaintiff's physical examination was normal (Tr. 274-76).

*Evidence During Relevant Period*

On March 1, 2011, Kathleen Broughan, Ph.D., conducted a review of the plaintiff's records (Tr. 284-300). Dr. Broughan assessed that the plaintiff did not meet any of the mental listings of impairments (Tr. 284-96). In evaluating the paragraph "B" criteria, Dr. Broughan concluded that the plaintiff had only mild limitations in activities of daily living and maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace (Tr. 294). In assessing the plaintiff's residual functional capacity ("RFC"), Dr. Broughan concluded that although the plaintiff would have difficulty understanding, remembering, and carrying out detailed instructions, he could perform simple tasks for at least two hour periods of time; perform simple, repetitive tasks without special supervision; attend work regularly; and accept supervisory feedback (Tr. 300).

On March 2, 2011, Dr. Hare performed another physical consultative examination. Dr. Hare described the plaintiff's history of seizure disorder. The plaintiff had

7

been having seizures for ten years, had not taken medication for two years, and had last had a seizure six years earlier. The plaintiff reported drinking alcoholic beverages (beer) on weekends (Tr. 302). The plaintiff's physical examination was normal except that he was near-sighted. He had a normal station and gait, full range of motion, normal fine and gross manipulation, and no neurological deficits (Tr. 303). Dr. Hare concluded the plaintiff had no exertional limitations, but could never climb ladders, ropes, and scaffolds and only occasionally climb ramps and stairs (Tr. 306-07).

In June 2011, Judith Von, Ph.D., conducted a review of the plaintiff's records (Tr. 323-39). Dr. Von concluded that the plaintiff did not meet or equal any mental listing (Tr. 323-35). Dr. Von concluded that the plaintiff had no restrictions in activities of daily living, mild limitations in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace (Tr. 333). In assessing the plaintiff's RFC, Dr. Von determined that the plaintiff would have difficulty understanding, remembering, and carrying out detailed instructions, but could perform simple tasks for at least two hours; perform single, repetitive tasks without special supervision; attend work regularly; accept supervisory feedback; and would be best suited for a job that does not require continuous interaction with the general public (Tr. 339).

In December 2011, the plaintiff was hospitalized for ten days after having grand mal seizures (Tr. 344). Prior to this time, the plaintiff reported his last seizure was "years ago" (Tr. 347). At the time of his admission, the plaintiff's ethanol level was 26, and alcohol withdrawal was suspected (Tr. 344). A brain CT showed bifrontal encephalomalcia (Tr. 365). During his admission, the plaintiff began taking seizure medication, which controlled his seizures (Tr. 344). At a follow-up appointment in January 2012, the plaintiff stated he was no longer drinking alcohol. The plaintiff continued to take anti-seizure medication (Tr. 342).

In March 2012, the plaintiff sought treatment for a seizure after running out of medication. At a follow-up appointment, the plaintiff's seizure medications were continued (Tr. 341).

*Administrative Hearing*

The plaintiff was 49 years old on his alleged disability onset date and 52 years old on the date of the ALJ's decision (Tr. 46). The plaintiff testified that he completed the 11th grade in regular classes, but did not graduate high school (Tr. 50-51). Later at the hearing, the plaintiff stated that he could not remember if he took special education classes, but he thought he may have taken them (Tr. 65). The plaintiff stated on a disability report that he did attend special education classes (Tr. 186), and he told Dr. Whitley that he attended regular classes (Tr. 270). The School District of Calhoun County, where the plaintiff attended high school, was unable to locate any special service records for the plaintiff (Tr. 283).

The plaintiff worked for Electrolux Home Products for 17 years until 2005 as a press operator (light, unskilled) and welder (medium, unskilled) (Tr. 59). The plaintiff also worked as a forklift operator (medium, semi-skilled), and warehouse laborer (medium, unskilled) (Tr. 74-75, 186, 191-93).

During the relevant period, the plaintiff was separated from his wife (Tr. 46). He lived with either his sister or his niece (Tr. 48, 50). He socialized with his brother twice a week (Tr. 55). The plaintiff cared for his personal needs, prepared small meals (i.e., sandwich or frozen dinners), shopped for groceries, put away his laundry, performed household chores (i.e., mopping sweeping, vacuuming, washing dishes, cleaning the bathroom, and occasionally taking out the trash), performed some gardening, watched television, and went to church (Tr. 55-58, 199-202). The plaintiff had a driver's license, but it was suspended for driving under the influence (Tr. 53). At the hearing, the plaintiff stated

that he could read the newspaper and that he could write more than his name and address as long as he wore his glasses (Tr. 52).

In February 2011, the plaintiff stated he could walk half of a mile without stopping to rest, pay attention for one hour, and finish what he started (Tr. 203, 211). At the hearing, the plaintiff testified that he could walk six or seven blocks in about 15 to 20 minutes, sit for two hours at a time, and lift 20 pounds (Tr. 77-78).

At the hearing, the plaintiff also testified that he drank a couple beers occasionally but had not gotten drunk since 2005 (Tr. 68-69). The plaintiff smoked half of a pack of cigarettes a day (Tr. 71).

*Vocational Expert*

At the hearing, the ALJ asked the vocational expert whether a hypothetical individual of the plaintiff's age, education, past work experience, and RFC could perform any of the plaintiff's past relevant work (Tr. 79). The vocational expert testified that such an individual could perform the plaintiff's past relevant work as a press operator as actually and generally performed (Tr. 79-80).

## ANALYSIS

The plaintiff argues that the ALJ erred by: (1) finding that his impairments did not meet or medically equal Listing 12.05(B); (2) improperly rejecting Dr. Whitley's medical opinion regarding his ability to read and write; (3) failing to properly consider his history of alcohol abuse; and (4) finding that he could perform his past relevant work (pl. brief at 1-4).

*Listing 12.05(B)*

The plaintiff first argues that the ALJ erred in finding that his impairments did not meet or medically equal Listing 12.05(B) (pl. brief at 1-2). The regulations state that upon a showing of a listed impairment of sufficient duration, "we will find you disabled without considering your age, education, and work experience." 20 C.F.R. §§ 404.1520(d), 416.920(d). A listing analysis includes identifying the relevant listed impairments and

comparing the criteria with the evidence of the plaintiff's symptoms. *Cook v. Heckler*, 783 F.2d 1168, 1173 (4th Cir. 1986) (stating that "[w]ithout such an explanation, it is simply impossible to tell whether there was substantial evidence to support the determination").

An individual does not meet Listing 12.05(B), regarding intellectual disability, unless his impairment satisfies both the diagnostic description in the introductory paragraph of the Listing and the criteria of paragraph B. 20 C.F.R. pt. 404, subpt. P, app.1, § 12.00A. Listing 12.05 provides in pertinent part:

> *Intellectual Disability*: Intellectual disability refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> \*\*\*
>
> B. A valid verbal, performance, or full scale IQ of 59 or less;
>
> \*\*\*

20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05(B).

As noted by the plaintiff, during testing in a consultative psychological examination by Dr. Whitley in July 2007, he scored a verbal IQ of 60, a performance IQ of 62, and a full scale IQ of 57. Dr.Whitley stated the test scores were a "mild underestimation" of the plaintiff's true ability. Dr. Whitley's diagnositic impression was borderline intellectual functioning to mental retardation[3] (Tr. 271-72).

The ALJ specifically considered Listing 12.05 and found as follows:

---

[3] Effective August 1, 2013, the Social Security Administration amended Listing 12.05 by replacing the words "mental retardation" with "intellectual disability." *See* 78 Fed. Reg. 46,499. The change "does not affect the actual medical definition of the disorder or available programs or service." *Id*. at 46,500.

11

> Although psychological testing in 2007 was consistent with borderline intellectual functioning, there is no evidence the claimant was diagnosed with low intelligence prior to age 22. The claimant reported he was in regular classes through the 11th grade, at which time he reported he quit school. There is no evidence the claimant was in special education classes (Exhibit 8F). Consultative examinations revealed normal mental status. I find the claimant's test score of a verbal IQ score of 60, performance IQ score of 62, and full scale IQ score fo 57 (Exhibit 4F) are inconsistent with the claimant's ability to work for 17+ years performing work such as a forklift operator, which is semiskilled work, or other various warehouse and production jobs. His scores are also inconsistent with his ability to perform the varied activities of daily living as previously mentioned. Accordingly, I find that his IQ score[s] are an underestimate of his actual level of functioning. This conclusion is supported by the opinion[s] [of] State agency psychological consultants, Kathleen Broughan, Ph.D., and Judith Von, Ph.D. (Exhibit 9F, 17F).

(Tr. 25).

The plaintiff argues, "Per Listing 12.05(B), a Plaintiff with a valid verbal, performance, or full scale IQ score of 59 or less meets the listed impairment. With this medical finding, the Plaintiff meets the requirement of the listing, and should automatically qualify for disability" (pl. brief at 2). The plaintiff is incorrect. As set forth above, to meet the diagnostic description or "capsule definition" of intellectual disability, an individual must have "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period [i.e., onset before age 22]." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.05. This has been described by the Fourth Circuit Court of Appeals as "Prong 1" of Listing 12.05. *See Hancock v. Astrue*, 667 F.3d 470, 473 (4th Cir. 2012). "If [a claimant's] impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria [paragraphs A through D], we will find that [the] impairment meets the listing." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(A). " '[A]daptive functioning' refers to the individual's progress in acquiring mental, academic, social and personal skills as compared with other unimpaired individuals of

12

his/her same age. . . ." POMS § DI 24515.056(D)(2), https://secure.ssa.gov/apps10/poms.nsf/lnx/0424515056. "Deficits in adaptive functioning can include limitations in areas such as communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety." *Jackson v. Astrue*, 467 F. App'x 214, 218 (4th Cir. 2012) (citing *Atkins v. Virginia*, 536 U.S. 304, 309 n.3 (2002)).

As the ALJ noted (Tr. 25), the plaintiff previously performed semi-skilled work as a forklift operator and various other warehouse and production jobs for over 17 years (Tr. 59, 74-75, 186, 191-93). *See Hancock v. Astrue*, 667 F.3d 470, 475-76 & n.3 (4th Cir. 2012) (holding that evidence was sufficient to support ALJ's conclusion that claimant had no deficits in adaptive functioning where, among other things, claimant worked several jobs and performed a variety of tasks which would be expected to be beyond the capacity of a mentally retarded person). This court has repeatedly upheld an ALJ's finding that a claimant did not have deficits in adaptive functioning based in part on a past ability to perform semi-skilled or skilled work. *See Weatherford v. Colvin*, C.A. No. 6:13-1885-RMG, 2014 WL 3881056, at *10 (D.S.C. Aug. 5, 2014); *Weedon v. Astrue*, C.A. No. 11–2971–DCN–PJG, 2013 WL 1315311, at *7 (D.S.C. Jan. 31, 2013), *adopted by* 2013 WL 1315206 (D.S.C. Mar. 28, 2013); *Jenkins v. Astrue*, C.A. No. 09–1653–JFA–PJG, 2010 WL 3168269, at *5 (D.S.C. Mar. 22, 2010), *adopted by* 2010 WL 3168268 (D.S.C. Aug.4, 2010).

The ALJ also explained that the plaintiff engaged in significant activities of daily living (Tr. 24-25). The plaintiff cared for his personal needs, prepared small meals (i.e., sandwich or frozen dinners), shopped for groceries, put away his laundry, performed household chores (i.e., mopping, sweeping, vacuuming, washing dishes, cleaning the bathroom, and occasionally taking out the trash), performed some gardening, watched television, went to church, and socialized with his brother on a weekly basis (Tr. 55-58,

13

199-202). The plaintiff also had a driver's license, which he lost only due to driving under the influence (Tr. 24-25, 53).

The ALJ further noted that there was no evidence the plaintiff was diagnosed with low intelligence prior to age 22, and there was no evidence he attended special education classes (Tr. 25). The plaintiff argues that the ALJ imposed an "additional burden" on him to provide his school records, which "constitutes legal error" (pl. brief at 2). Counsel notes that attempts were made to obtain the plaintiff's school records, but he was told the records had been destroyed by the school district when the school district was desegregated (*id.*). In his reply brief, the plaintiff goes further and argues that "requiring the Plaintiff to produce the school records to qualify for disability under this provision is a violation of the Plaintiff's Fifth and Fourteenth Amendment rights under the U.S. Constitution" (pl. reply at 1 n.1). However, it is unclear whether the plaintiff even attended special education classes given the plaintiff's inconsistent statements throughout the record (Tr. 50-51, 65, 186, 270). As argued by the Commissioner, even if the plaintiff had attended special education classes, this fact alone does not establish that he had deficits in adaptive functioning that manifested prior to age 22. *See, e.g., Sims v. Colvin*, C.A. No. 14-1663, 2015 WL 5525096, at *12-13 (D.S.C. Sept. 17, 2015) (upholding an ALJ's finding that the plaintiff did not prove deficits in adaptive functioning despite evidence that the plaintiff attended special education classes and read at a fourth grade level).

Furthermore, the plaintiff's argument that his 2007 IQ scores establish that he had a deficits in adaptive functioning manifesting prior to age 22 (pl. brief at 2) fails. The record shows that the plaintiff sustained a brain injury in 2005 (age 45) that caused cerebral, cerebellar, and subarachnoid hemorrhage and could have negatively affected his level of cognitive functioning after age 22 (Tr. 344). Thus, the plaintiff's IQ scores at age 45 after he sustained his brain injury may not be an accurate reflection of his level of adaptive functioning prior to age 22 and prior to his brain injury.

14

The ALJ further found that the plaintiff did not satisfy the additional criteria of 12.05(B) because he does not have a "valid" IQ score below 59 (Tr. 25). Paragraph B requires a valid verbal, performance, or full scale IQ of 59 or less. 20 C.F.R. pt. 404, subpt. P, App. 1, §§ 12.05(B). An ALJ is not required to accept a claimant's IQ scores and may reject IQ scores that are inconsistent with the record. *Hancock*, 667 F.3d at 475. Here, the ALJ explained that the plaintiff's IQ scores were an underestimate of his actual level of functioning (Tr. 25). As noted by the ALJ in the RFC finding, Dr. Whitley, the consultative examiner who administered the IQ test, opined that the scores were a "mild underestimation" of the plaintiff's true abilities (Tr. 27; *see* Tr. 271). In discounting these IQ scores, the ALJ relied upon the plaintiff's ability to work for over 17 years performing jobs such as the semi-skilled job of a forklift operator and other various warehouse and production jobs (Tr. 25; *see* Tr. 59, 74-75, 186, 191-93). The ALJ also explained that the plaintiff's IQ scores were inconsistent with his ability to perform varied activities of daily living, as described above (Tr. 24-25; *see* Tr. 55-58, 199-202).

In finding that the plaintiff did not meet listing 12.05(B), the ALJ also relied upon the opinions of the State agency psychologists that the plaintiff failed to meet a mental listing (Tr. 25). Drs. Broughan and Von concluded that the plaintiff did not meet or medically equal a mental listing and instead found that the plaintiff could perform a limited range of unskilled work (Tr. 284-96, 300, 323-35, 339). The ALJ was required to consider the state agency physician assessments as opinion evidence. *See* 20 C.F.R. §§ 404.1527(e)(2)(i), 416.927(e)(2)(i) ("State agency medical and psychological consultants . . . are highly qualified physicians, psychologists, and other medical specialists who are also experts in Social Security disability evaluation. Therefore, administrative law judges must consider findings and other opinions of State agency medical and psychological consultants . . . as opinion evidence, except for the ultimate determination about whether you are disabled."). *See* SSR 96-6p, 1996 WL 374180, at *3 ("In appropriate circumstances, opinions from

15

State agency medical . . . consultants . . . may be entitled to greater weight than the opinions of treating or examining sources."); *Gordon v. Schweiker*, 725 F.2d 231, 235 (4th Cir.1984) ("[T]he testimony of a non-examining, non-treating physician should be discounted and is not substantial evidence when totally contradicted by other evidence in the record. . . . [W]e have also ruled that the testimony of a non-examining physician can be relied upon when it is consistent with the record.") (citations omitted).

Based upon the foregoing, the undersigned finds no error in the ALJ's determination that the plaintiff did not meet or medically equal listing 12.05(B). However, as will be further discussed below, the undersigned recommends that the case be remanded to the ALJ for further consideration of the plaintiff's limitations in his ability to read and write. Specifically, while the plaintiff stated that he could read the newspaper and that he could write more than his name and address as long as he wore his glasses (Tr. 52), in testing done by Dr. Whitley, the plaintiff scored at a 1.3 grade level for reading (Tr. 272). On remand, the ALJ will be able to reconsider and re-evaluate the evidence as part of the overall reconsideration. *Hancock v. Barnhart*, 206 F. Supp.2d 757, 763–764 n.3 (W.D. Va. 2002) (on remand, the ALJ's prior decision has no preclusive effect as it is vacated and the new hearing is conducted *de novo*). Accordingly, as part of the overall reconsideration of this case upon remand, the ALJ should also consider and address the plaintiff's allegations regarding the Listing analysis at step three.

### *Ability to Read and Write*

The plaintiff next argues that the ALJ impermissibly rejected medical evidence from Dr. Whitley regarding the plaintiff's ability to read and write (pl. brief at 2). In Dr. Whitley's consultative examination, the plaintiff demonstrated a 1.3 grade reading score and a 3.7 grade math score on achievement tests, which Dr. Whitley described as a "mild underestimation" of the plaintiff's true abilities (Tr. 271-72). The plaintiff contends that the ALJ "rejected [the plaintiff's] medical source with his own lay opinion" (pl. brief at 2). The

Commissioner argues that the ALJ fully accounted for the plaintiff's limitation in reading and writing by restricting him to unskilled work and finding the plaintiff could perform the same job he previously performed (Tr. 26, 31).

The ALJ included no limitations in the RFC finding as to the plaintiff's ability to read and write. While the plaintiff did testify that he could read a newspaper and write more than his name and address, the questioning by the ALJ on this topic was very brief (Tr. 52). The documents submitted by the plaintiff to the Administration were completed by persons other than the plaintiff (Tr. 198-205, 206-13), and, as noted above, the plaintiff demonstrated only a 1.3 grade level reading score on achievement testing.

Given the evidence of record regarding the plaintiff's limitations in reading and writing and the ALJ's failure to explain the weight given to the evidence, the undersigned cannot say that the ALJ's RFC finding is based upon substantial evidence. This is particularly troubling given that the ALJ found that the plaintiff could perform his past relevant work as a press operator, both as it is actually and generally performed (Tr. 31). The *Dictionary of Occupational Titles* provides the following reading and writing requirements for this occupation:

> READING: Passive vocabulary of 5,000-6,000 words. Read at rate of 190-215 words per minute. Read adventure stories and comic books, looking up unfamiliar words in dictionary for meaning, spelling, and pronunciation. Read instructions for assembling model cars and airplanes.
>
> WRITING: Write compound and complex sentences, using cursive style, proper end punctuation, and employing adjectives and adverbs.

DICOT 690.685-014, 1991 WL 678500. Based upon the foregoing, the undersigned recommends that the case be remanded to the ALJ for consideration and explanation of the weight given to the evidence regarding the plaintiff's ability to read and write. Furthermore, following the ALJ's decision in this case, the Court of Appeals for the Fourth Circuit issued an opinion finding that an ALJ does not account for a claimant's limitations

in concentration, persistence, and pace by restricting the claimant to simple, routine tasks or unskilled work. *Mascio v. Colvin*, 780 F.3d 632, 638 (4th Cir. 2015) (quoting *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1180 (11th Cir. 2011) (joining the Third, Seventh, and Eighth Circuits)).  Here, both State agency psychologists concluded that the plaintiff had moderate difficulties in maintaining concentration, persistence, or pace (Tr. 294, 333). The ALJ limited the plaintiff in the RFC finding to "simple, routine tasks" and "occasional ongoing interaction with the general public" (Tr. 26).  This issue was not specifically raised by the plaintiff here but should be considered by the ALJ upon remand.

*Past Alcohol Abuse*

The plaintiff next notes that the medical record contains several references to alcohol use and argues, "Given the entirety of Plaintiff's medical record, and the results of the consultative exam, it is clear that Plaintiff's mental condition is not likely to improve to the point of nondisability absent any alcohol use" (pl. brief at 3). The plaintiff cites SSR 13-2p (*id.*), which explains the Administration's "policies for how we consider whether drug addiction and alcoholism (DAA) is material to our determination of disability . . . ." 2013 WL 621536, at *1. Under the Commissioner's regulations, where a claimant is found to be disabled at a step in the sequential evaluation process but has a DAA, the ALJ conducts an analysis to determine which of a claimant's limitations would remain if the claimant stopped using drugs or alcohol. 20 C.F.R. §§ 404.1535(b)(2), 416.935(b)(2).  Here, the ALJ did not reach this question as he did not find the plaintiff to be disabled.  Moreover, the ALJ found the plaintiff's history of alcohol abuse to be a nonsevere impairment (Tr. 24). Upon remand, should the ALJ find that the plaintiff is disabled at any step, the plaintiff's history of alcohol abuse should be considered and evaluated in accordance with the above regulations and SSR 13-2p.

*Past Relevant Work*

Lastly, the plaintiff argues that the ALJ erred in finding that he could perform his past relevant work (pl. brief at 3-4).  As discussed above, the undersigned recommends that, upon remand, the ALJ be instructed to consider and explain the weight given to the evidence regarding the plaintiff's ability to read and write.  Further, at the fourth step of the sequential evaluation, the ALJ should be instructed to consider any such limitations in determining whether the plaintiff can perform his past relevant work.  The ALJ should also consider the plaintiff's other allegations of error regarding the step four finding (pl. brief at 3-4).

## **CONCLUSION AND RECOMMENDATION**

Now, therefore, based on the foregoing, it is recommended that the Commissioner's decision be reversed pursuant to sentence four of 42 U.S.C. § 405(g) and that the case be remanded to the Commissioner for further consideration as discussed above.

IT IS SO RECOMMENDED.

s/ Kevin F. McDonald  
United States Magistrate Judge

May 17, 2016  
Greenville, South Carolina